Good morning, Your Honors. Ina Lipkin for the Law Offices of Kuldeep Dhariawal for the Petitioner. I believe this case was erroneously denied by both the IJ and the Board on several grounds. The first ground is that the IJ failed to make a cogent credibility finding. He alluded to some inconsistencies. He made a statement that some of the evidence was ambiguous, but he did not specifically state what he found about the Petitioner's testimony to be incredible. Secondly, the major mistake here is that the IJ failed to find persecution on a protected ground. Despite the fact that the Petitioner testified credibly and clearly established that he was persecuted on his political opinion due to his membership in the Shiremani Akali Dalman political party, due to an imputed political opinion that the Punjabi police applied to him. And thirdly, because of his affiliation to the Sikh religion. The IJ found that the arrests and the beatings that followed were linked to imputed political activity. I notice you say imputed because you really can't link it to political activity. At least the first episode and possibly the second came before he started any serious political activity by his testimony. So what's the imputed connection? Well, let me start with the second arrest. I think that's a little more clear on the facts in this record. He had attended a political rally. He had shouted pro-Khalistani slogans. As we know, Khalistan is the Sikh ideal for their separate homeland, apart from the Hindu rule. He had made anti-government statements. So there, it's not just an imputed political opinion, it's clearly his political opinion. It's compared with his father, for example, or I think his brother. His father was the village leader for many years, and there's no allegation that his father was being harassed because of that. Your Honor So his political activity, I mean, he's drawing the inference. Nobody can say what the police were thinking about. I understand that. But it seems to me a pretty low-level inference when his level of activity was nonexistent for the first arrest and minor, at best, for the second. Well, Your Honor, how do you account for the fact that the police accused him of being Khalistani during his second arrest? Why mention that if they were not adverse to him being a Khalistani? If that was okay, why arrest him? Why torture him? Why torture him to the point of losing consciousness if they agreed with his political opinion or didn't care about it? I think it's clear that his shouting of the slogans, the fact that the police mentioned it during their arrest, hey, you're a Khalistani, we don't like it, and beat him thereafter, is a clear warning. It's a blink of imputed political opinion. I'm going to go back to the first arrest. It's true, at that time he was not politically active. And that arrest stemmed from an altercation between his family members and the police over some electrical transformers regarding the farming activities. However, he stated, and he testified credibly, and again, the IJA did not make an incredibility finding, that not only he was arrested, but other young Sikh men were arrested. So here, the grounds of persecution are religious affiliation. And of course, at that time, the police targeted young Sikhs because there was this assumption that all young Sikh men were pro-Khalistani. Again, a sentiment that the Punjabi police, under the directives of the Indian government, strove to squelch. As regards to the third arrest, I think that the IJA also made a mistake by failing to find persecution on mixed motives. On the one hand, the police already knew about this petitioner. They'd already arrested him twice. They already had him down as somebody who was anti-governmental. And there was a bomb blast that they accused him of having knowledge of. Whether they truly believed that he had knowledge in this case is almost irrelevant, because they clearly also wanted to extort money from him. And this Court has held that selective criminal extortion can be another grounds of persecution. Let me focus on the third arrest and a different facet of it, because it included some of the other grounds of persecution. Some of the most unusual testimony, I confess, I have encountered, having to do with what he said happened to him after the third arrest. And in particular, he testified that he had been beaten with wooden rods, leather straps, stretched his leg apart. And then he was asked, well, actually his counsel had to lead him to the answer he was supposed to give. He was asked, anything else? No. You sure nothing else? No. He was asked before about being suspended from the ceiling after the second arrest. Do you remember now whether you were suspended from the ceiling? Answer, I think they did. And then, why did he miss that before? I do not remember. It slipped my mind. Being suspended from the ceiling was identified as perhaps the most horrific part of the treatment. And I find it difficult to understand how somebody would respond, I think they did, if that's supposed to be the hallmark of his case. Frankly, it suggests, I think they did, suggests that I'm not sure if that was part of the script for that arrest or not. That by itself kind of howls out to me that there's a credibility problem with this person. Isn't that a basis for concern? It is, Your Honor, certainly. But let's take everything here into context. If we believe the petitioner's testimony that he went through three episodes of horrific torture, is it not conceivable to think that he may have tried to suppress some of those memories and that may have caused him to omit this particular facet of his persecution? Or how about the fact that he did mention it for his second arrest and it might have all melded into one in his mind. But really the point here is that he was so severely mistreated and the events had occurred that he was not able to I think six, seven or even eight years prior to the hearing, is it not reasonable for him to have possibly forgotten that momentarily? I don't think that that would really undermine all of his other previous credible testimony. Well, but the credibility determination is sort of the problem because in all of these cases there's one story being told and the government doesn't have any independent evidence, so the exercise becomes one of listening to the story and trying to figure out if it hangs together. Frankly, if the IJ had made an adverse credibility determination in the way that properly could have been made, I think he'd have a hard time here trying to sustain this testimony based on this and other things said by the individual. Now, he didn't make that determination, which is really why we're here. But I have to say I've got real doubts about the answer I think they did. It just seems to be not the answer somebody who had actually suffered that treatment would have given. Your Honor, but hasn't this Court found that an omission from the testimony in comparison to the written declaration? Not just an omission, not just, oh, yes, they did. I think they did. You say I think they did when you're not sure. If you've been suspended upside down from the ceiling, and that's the hallmark of your case, you probably are going to remember. And if you're not sure, it suggests to me that maybe you're not sure because you're not sure if it was part of the script or not. Well, Your Honor, on the other hand, he did not exaggerate the events that he stated occurred to him, which what I think was the case. We don't know whether he exaggerated or not. That's our problem. We don't know really what happened. We're taking his word for it. And if you're stuck in the position of having to decide whether he's telling the truth based on what he's saying, I mean, you can't say he's not exaggerating because he didn't make it even worse. We don't know that what he's saying to us happened. Your Honors, I would simply argue that in light of the other credible and consistent testimony that this mistake, if deemed to be a mistake or an omission, is minor and would not go to the heart of the claim. Did you want to reserve a minute or so for rebuttal, Ms. Lipkin? Thank you. I'd please the Court. Donald Kuvion for Respondent. Your Honors. You look like the guy who was here on the last case. I hope not. Your Honors, first, a clarification. The record does not support the contention that the father's and uncle's shootout with the police in 1988 or 89 has anything at all to do with the 1993 arrest. It was proffered, but there was no connection made, and it was discounted as a connection. Now, with that said, we briefed the case and we argued the case, and unfortunately, it has not been clearer to the public. I would like to remind the Court that the first incident was found to be not persuasive because it was not on account of a cognizable reason. The judge said, for example, I cannot connect this incident to any political activity. Now, I concede that his language and the way that he articulates it is not the best in the world. And but we read the second and third arrest and incidents to be denied on the basis of adverse credibility. I apologize that the brief did not apparently make that sufficiently clear. Show me where in the I.J. decision the I.J. makes an explicit adverse credibility determination. If explicit means he calls it that, then he doesn't. But the language that he employs throughout, most especially in regard to the second and third incidents, most reasonably can be read in that manner. And that's the best reading I can give to it. When I read this opinion, what I took the I.J. to be saying is, well, first of all, I couldn't find an explicit adverse credibility determination, which is required by our case law. But I took what his bottom line to be was that, okay, I'll accept all this testimony, but that's insufficient to carry the burden of proof of demonstrating past persecution. I will not argue that it cannot be read that way. And I think reasonably can. Okay. So assume you read it that way. What case law supports the I.J.'s position that the three incidences under our case law don't support a finding of past persecution? Cite me a case. All right. Well, on the first one, we do have explicit language that it's not connected to anything political, period. And I think it's important to note in the testimony during the first one that when he was arrested, the police interrogated him about a killing done by Sikh militants and beat him, and that they asked him about the names and addresses of militant Sikhs. What do you make of that evidence or that testimony related to the arrest? What I make of that and what I make of the other two, which are similar in that regard, is that this is the standard method of operation of the police in Punjab. They conduct sweeps. When something happens, they round up what in a Bogart movie would be called the usual suspects, the people that they think are involved, the people that they know are sympathetic to or assist in any manner, the insurrectionists. We have to remember. So wouldn't that be imputing at least a sympathy for the militants if they were rounding him up as part of the group that they suspect? It's standard Indian police methods to beat you up when they question you. I mean, it seems to happen in every case. You have to focus on who. I think Judge Wardlaw's question is when Captain Renaud knew that the usual suspects hadn't shot Major Strasser. But you get the usual suspects because they're on the hit list. So this guy somehow is on the hit list to be picked up if there's an episode, whether they know if he's guilty or not. And isn't being on the hit list, being identified as one of the usual suspects itself reflective of being persecuted or singled, not level of persecution, I'm speaking of the degree of beating, but being singled out for a reason that qualifies as a religious or political reason? I think the thing that can distinguish what happened here and what often happens in similar cases is that it was for a police purpose, we know. But without doubt that a very serious, violent insurrection began in the 1980s in Punjab. Punjab is the home of the Sikhs. They comprise not less than half the population of that state. And we know that Sikhs are prominent in every level of society in India, throughout India, including Punjab. The insurrection involved terrorist activities, bombings, assassinations, not only of police and army personnel, but civilians. In the very early 90s, India got serious about doing something about it, and they stopped it. In the course of doing that, the police acted very roughly and brutally. In this case, there's never an allegation that any policeman made any type of a slur or a comment against him, anything like, we're doing this just to teach you a lesson. In every instance, he said, I was asked, who do you know, where do they hide, what do they do? Do you assist them? In every instance. And we know for a fact that he and his family, with his prominent father, not only sympathized, but supported the faction within the Sikh political community, which is not united, by the way, but they supported the faction that openly supported secession, which was the Akali Dalman faction. He began his testimony with the words, quote, we demand Khalistan, a separate country for Sikhs. So he's never hidden, and his family's never hidden their sympathy. So it should come as no surprise that when the police seek information, that he or other members of his family are rounded up. Well, that seems to confirm the allegation, though, that he's being rounded up because he has that political opinion. Now, you may say it's because they're investigating a crime related to that, but it still focuses on political opinion. If he goes back and maintains the same political opinion, he'll still be subject to being rounded up and beaten. And unless you can say that, yeah, but they're doing it to a criminal, he's involved in the criminal acts, the fact that they justify focusing on people with that political belief, because somebody with that political belief conducts terrorist acts, is small satisfaction to him. He goes back, he's got that political belief, he's going to get picked up and beaten again. This type of case is very troublesome, I suspect, to everyone, because if you're talking about strictly a criminal context, the police obviously don't, whether they do sweeps or whether they focus on individuals, wherever it is in the world. When you're looking for, for example, a swindler, you don't go out and investigate your list of child molesters, et cetera. You focus on the person or persons that might have what you want. When we get into this insurrection context and political beliefs, I would contend that there's a lot more to it than that. It would require something to show that they're going beyond the inquiry. Of course they're going to, remember, like I said, they like to round all these people up, and they're going to round up and encourage them to talk. And they're going to look at people that might have the information. They're not going to go over to the Hindu house across the street who supports the Congress Party and beat him up and get information out of him. They're going to go to whoever has the information. And the fact that, what I'm suggesting is that if everyone who is identified in any way with a political persuasion, by that reason alone, they're going  And if the person, when he's the focus of a police investigation, encounters persecution, then every, then a sizable portion of the Sikhs and others, perhaps, in the Punjab, should be granted asylum. Thank you very much. Ms. Lipkin, back to you. Your Honor, just a brief follow-up. In regards to the first arrest especially, the Respondent stated that that was a, I think he intimated, that was a legitimate arrest, and the police were acting on a legitimate prosecutorial grounds. However, that kind of treatment that the Respondent received of being falsely accused of having political opinions and of being brutally beaten and then extorted for money in the form of a bribe for his release really constitutes an invidious or pretextual prosecution. Because the punishment he received was disproportionate to whatever crime that the government alleged he had committed. And in fact, they did not ever, or the Petitioner did not testify to being put through a criminal prosecution. His prints were not taken, his photo was not taken, he was not taken before a judge or court of law. No formal charges were placed against him, and therefore, that established mixed motives as well. Thank you very much. The next case, 0371861, Gunawan v. Gonzalez, is submitted on the briefs.
judges: Thomas, Silverman, Clifton